## Keith FORSYTH
v.
## Richard G. KLEINDIENST, et al.
### Civ. A. No. 72–1920.

United States District Court,
E.D. Pennsylvania.

Nov. 12, 1982.

On Motion to Certify for Immediate Interlocutory Appeal Dec. 3, 1982.

David Rudovsky, Philadelphia, Pa., for plaintiff.

Gordon W. Daiger, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

### I. *Facts and Procedural History of Case*

Plaintiff Keith Forsyth ("Forsyth") initiated this action in 1972, seeking to recover damages in connection with the federal government's electronic interception of telephone conversations that he had with Professor William Davidon ("Davidon"), the subject of a government wiretap. Plaintiff contends that these interceptions violated his rights under 18 U.S.C. § 2510, *et seq.* (The Omnibus Crime Control Act) and the First, Fourth and Ninth Amendments of the Constitution. Though plaintiff's complaint originally named former Attorney General Richard Kleindienst and former FBI Director L. Patrick Gray, he subsequently admitted that the claims against them should be dismissed. On February 14, 1978, the Court entered an order dismissing plaintiff's complaint as to these two defend-

ants. The defendants remaining in this action are former United States Attorney General John Mitchell, who authorized the wiretap at issue, and two employees of the Federal Bureau of Investigation ("FBI"), who actually intercepted the conversations involving plaintiff.

It is undisputed that the wiretap placed upon Davidon's telephone was warrantless and without court approval. The electronic surveillance was in effect during December, 1970 and January, 1971. Conversations involving Forsyth were intercepted on three occasions in early December, 1970 and were recorded by the government. None of these interceptions involved conversations between the plaintiff and his attorney. One conversation between Forsyth and Davidon was disclosed in camera to a judge presiding over a criminal proceeding in which Davidon's activities were considered. Other than this disclosure, the government made no use or disclosure of any of Forsyth's intercepted conversations with Davidon. Plaintiff and the defendants have stipulated, regarding plaintiff's private right of action pursuant to the Fourth Amendment, that Forsyth has suffered no pecuniary losses, loss of financial advantages, impairment of reputation, pain and suffering, and has neither been inhibited nor chilled in the exercise of his First Amendment rights as a consequence of being overheard in the course of the warrantless electronic surveillance at issue in this case. (Docket No. 36, filed March 2, 1976).

After discovery was completed, both parties moved for summary judgment. In its Memorandum of February 14, 1978, the Court denied both motions, 447 F.Supp. 192 (E.D.Pa.1978). The United States Court of Appeals for the Third Circuit subsequently remanded this case and that of *Burkhart v. Saxbe,* 448 F.Supp. 588 (E.D.Pa.1978), "to conduct any additional inquiry that may be necessary and to apply the test [for determining the scope of official immunity to be accorded Attorney General Mitchell] enunciated here." *Forsyth v. Kleindienst,* 599 F.2d 1203, 1217 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997

(1981), *reh. denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981). The Third Circuit decision otherwise affirmed the factual findings and legal conclusions of this Court. This Court was instructed to determine, however, whether defendant Mitchell should be accorded an absolute immunity from suit in light of the Third Circuit's *Forsyth* test and the seminal Supreme Court cases of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), or whether he is entitled to only a qualified good faith immunity. Thus, this case was remanded for determination of a narrow question. A hearing was held in this matter on January 8, 1982. At the hearing, the government submitted an additional affidavit and exhibits and asked this Court to reconsider its earlier denial of the government's summary judgment motion as well as its other legal conclusions adverse to the government. For the reasons hereinafter set forth, the Court determines that former Attorney General Mitchell is not entitled to absolute immunity under the circumstances of this case. The Court will grant plaintiff's motion as to liability only as to John Mitchell.

## II. *The Test for Assessing the Scope of Defendant Mitchell's Immunity*

In *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir.1979), the Third Circuit presented an exhaustive discussion of the state of the law regarding the immunity of federal government officials sued by plaintiffs alleging that the officials had deprived them of a federal constitutional right, 599 F.2d at 1209–17. The Third Circuit stated that under *Imbler v. Pachtman, supra,* a government attorney possesses absolute immunity from suit for actions taken while he was acting in a prosecutorial capacity but that he possesses only a qualified good faith immunity for his actions as an administrator, investigator, or supervisor of department activities other than specific litigation. The Court recognized, however, that the distinction between these roles may not always be clear. Said the Court:

This case, dealing essentially with investigative activity, is within that gray area. We recognize that the decision of the Attorney General or a prosecuting attorney is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decision-making and the potential for needless actions. We believe that the *right to make the decision without being subject to suit must include some limited right to gather necessary information.* At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutors' investigative activities. We hold only that *to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.*

\*　　\*　　\*　　\*　　\*　　\*

Our reading of *Butz* and *Imbler* leads us to the conclusion that the Attorney General's decision to authorize the warrantless electronic surveillance is protected by the shield of absolute immunity when it is made in the context of a quasi-judicial function [prosecution]; however, *when the decision arises in the context of a purely investigative or administrative function, the decision will not be protected by absolute immunity.*

599 F.2d at 1215 (emphasis added and citation omitted).

The government has also urged this Court to consider whether former Attorney General Mitchell, as the ranking Justice Department official empowered, within the executive branch, to approve warrantless national security wiretaps, enjoyed quasi-judicial absolute immunity similar to the judicial absolute immunity of a magistrate or judge approving such wiretaps. The

government reasons that defendant Mitchell's role in approving the wiretaps, pursuant to the orders of President Lyndon Johnson, paralleled that of a magistrate (Government pre-hearing brief at 12). However, a close reading of the Third Circuit's opinion in this case indicates that the Third Circuit was well aware that *Butz v. Economou* contains language which may be read as creating an absolute immunity for non-judicial branch officials acting in an adjudicatory role. 438 U.S. at 512–15, 98 S.Ct. at 2913–15, 599 F.2d at 1210. However, the Circuit Court did not find the instant case to fall within this narrow subset of immunity cases. Rather, the appellate decision focused on the applicable test for determining whether defendant Mitchell was acting within a prosecutorial role and thus entitled to absolute immunity. 599 F.2d at 1211–17.

█ The instant case was remanded to this Court to determine whether defendant Mitchell met the "prosecutorial" quasi-judicial immunity of *Imbler* and *Butz*, not whether Mitchell might receive the "adjudicatory" quasi-judicial immunity mentioned in *Butz* and accorded to Administrative Law Judges. If this Court were to determine this possible basis for immunity, it would conclude that defendant Mitchell was not engaged in a sufficiently adjudicatory role when approving the wiretap at issue. His decisions approving this and other electronic surveillance were merely part of the executive branch's internal procedure for instituting such surveillance. It appears to this Court that this decision-making process was placed in the hands of the Attorney General who, as the Attorney General, has the ultimate responsibility for the operations of the FBI. At the time when the Davidon wiretap was commenced, the District of Columbia was amply supplied with magistrates and judges from whom the Justice Department could have easily sought a warrant for the wiretap, requesting that the record of the proceeding be sealed in the interests of national security. Instead, the executive branch operated its own system of commencing wiretaps apart from the judiciary, with the Attorney General

substituting his approval in lieu of a warrant. It would create a dangerous precedent for this Court to approve this procedure in which the Justice Department acted as its own in-house "judicial" oversight. Defendant Mitchell may only receive absolute immunity if he meets the "prosecutorial role" test enunciated by the Third Circuit.

*Imbler v. Pachtman* held "only that in initiating a prosecution and in presenting the state's case, the prosecutor is immune from a civil suit for damages under [42 U.S.C.] § 1983." 424 U.S. at 431, 96 S.Ct. at 995. As the Third Circuit observed, the Supreme Court in *Imbler* "utilized a functional approach. It suggested that even a prosecuting attorney would not be absolutely immune from suit for actions which are not closely connected with the judicial process." 599 F.2d at 1213.

III. *Defendant Mitchell's Actions in this Case*

█ In reviewing the record in this case, this Court must determine whether defendant Mitchell's authorization of the wiretap affecting the plaintiff was "closely connected with the judicial process" and whether it was "necessary to initiate a criminal prosecution." Based on the record in this case, the Court determines that defendant Mitchell's conduct was not so closely connected or essential to a criminal prosecution to bring him within the "quasi-judicial immunity" discussed in *Imbler* and *Butz*.

The Court has previously reached this determination in making its first decision as to the cross-motions for summary judgment, (*see* 447 F.Supp. 192, 201) in which Memorandum the Court found that defendant Mitchell was not entitled to absolute immunity because he "was functioning as an administrator rather than as an officer of the court." (447 F.Supp. at 201). Implicit in the Court's ruling was a determination that Mitchell had not been acting to gather information necessary for a criminal prosecution but that he was acting in an investigative capacity so that his activities

fell outside the scope of the absolute immunity discussed in *Imbler v. Pachtman, supra,* a decision that preceded this Court's Memorandum of February 14, 1978. In again reviewing the uncontested facts in deciding the cross-motions for summary judgment pursuant to the Third Circuit's remand, the Court once again determines that defendant Mitchell was not engaging in conduct subject to the prosecutorial absolute immunity of *Imbler v. Pachtman.*

In his deposition, defendant Mitchell repeatedly stated that the Davidon wiretap had an investigatory purpose, *i.e.,* to obtain more details about the suspected plot to destroy utility tunnels in Washington, D.C. and to kidnap National Security Council Chairman Henry Kissinger so that the Justice Department, acting through the FBI, might thwart these schemes. The purpose of the wiretap was prevention—not prosecution. Therefore, the information gathering that took place was not "necessary to a prosecutor's decision to initiate a criminal prosecution", 599 F.2d at 1215. It appears, based on this record, that Attorney General Mitchell was not in any way weighing factors in order to determine whether and whom to prosecute. He was already quite aware of the existence of the plots and some of the individuals involved. The Justice Department sought more specific information about the operationalization of the plots so that it might prevent their success. The Justice Department already had sufficient information to seek an indictment or information against Davidon, Father Phillip Berrigan and Sister Elizabeth McAlister, the three persons who had discussed the possibility of kidnapping Henry Kissinger (*see* 447 F.Supp. at 195). Thus, the Davidon wiretap was not directed at obtaining evidence in order to make a criminal case against these three or any of their associates. *See* depositions of John N. Mitchell: October 23, 1975 at 16–20, 28–32, 48–60 (in *Forsyth v. Kleindienst*) and October 14, 1976 (in *Burkhart v. Saxbe*) at 6.

Furthermore, Mr. Mitchell himself stated that as Attorney General he was not advised of the initiation of criminal proceedings by the Justice Department and that he did not know if a criminal investigation was pending regarding Davidon or other members involved in the utility tunnel and Kissinger plots. In his deposition of October 23, 1975 at page 30, Mr. Mitchell was asked:

Q. When you received this request [from FBI Director J. Edgar Hoover for authorization for the Davidon wiretap], did it occur to you that the information that could be obtained or would be obtained as a result of this tap could be used in a criminal proceeding prosecution?

A. It was not the point of my focus in authorizing the electronic surveillance.

Q. What was the point of your focus?

A. The gathering of information necessary to protect the national security and to get information on foreign intelligence.

At no time in the course of this litigation has defendant Mitchell repudiated the aforementioned statements or any other portion of his deposition. After the Third Circuit's remand, this Court set a hearing for the purpose of determining whether the Attorney General authorized the wiretaps in this case for the purpose of obtaining information to initiate a criminal prosecution, or whether defendant Mitchell acted as an investigator and/or administrator (Order of December 1, 1981). Prior to the entry of this Order, several conferences were held in chambers. At these conferences and at the outset of the hearing of January 8, 1982, the Court informed both parties that they could present any evidence they wished concerning Attorney General Mitchell's purpose in approving the wiretaps. Prior to the hearing of January 8, 1982, the government filed a memorandum of law, an affidavit, and several accompanying exhibits. At no time, however, did the government present any evidence, documentary, testimonial, or otherwise, suggesting that defendant Mitchell meant anything other than what was said in his deposition. The Attorney General stated that he approved the wiretaps as part of a national security investigation. The Court has taken defendant Mitchell at his word.

The government has submitted several exhibits designed to show that there was ample cause to commence criminal prosecution of Prof. Davidon, the Berrigans, and their associates. However, none of these materials address the issue of defendant Mitchell's role in approving the wiretap at issue. If anything, the government's submissions in this regard show that the Davidon wiretap was not necessary for gathering information to commence criminal actions against the Berrigans and their associates but that the Davidon tap could have been installed only for investigative purposes. If Davidon and persons with whom he spoke (*e.g.,* Forsyth) were to be criminally prosecuted, then the electronic surveillance would clearly be outside the purported "national security" exception to the Fourth Amendment's warrant requirement which the government contended existed until this position was flatly rejected by the United States Supreme Court in *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter cited as *Keith* ).

Thus, regardless of whether the Davidon wiretap was motivated by a legitimate national security concern or a good faith belief that there existed a legitimate national security concern, as the defendants contend, or was an invasion of the privacy of political dissidents conducted under the guise of national security, as the plaintiff contends, there is no doubt that defendant Mitchell has consistently taken the position that the Davidon tap "arose in the context of a purely investigative or administrative function" on his part. Applying the test set forth by the Third Circuit, this Court concludes that defendant Mitchell does not have absolute immunity from suit in this matter but is limited to a good faith immunity.

IV. *Recent Supreme Court Decisions and the Clarity of Plaintiff's Constitutional Protection Against Warrantless Electronic Surveillance*

Defendant contends that the recent Supreme Court decisions of *Nixon v. Fitzger-* *ald,* —— U.S. ——, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) and *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) require a different result. However, the *Fitzgerald* cases, which concerned the scope of the President's absolute immunity and the scope of a government officer's qualified immunity, do not afford immunity to defendant Mitchell in this case. *Nixon v. Fitzgerald* held that a former President of the United States is entitled to absolute immunity from liability for damages predicated upon his official acts (102 S.Ct. at 2701). In reaching this holding, the Court continued to apply a functional test for determining the scope of immunity of government officials as developed in cases such as *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) and *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *Nixon v. Fitzgerald* did not repudiate these cases but took pains to delineate how it was in fact consistent with the court's previous holdings regarding official immunity. *See* 102 S.Ct. at 2699–2702. The court determined that the President's "unique status under the Constitution distinguishes him from other executive officials." (102 S.Ct. at 2702). The court expressly distinguished the President's situation from that of cabinet officers such as the attorney general. *See* 102 S.Ct. at 2702. Thus, the recent *Nixon v. Fitzgerald* decision does not bolster the defendant's argument for absolute immunity, an argument which this Court has rejected (pp. 1251–1253, *supra* ).

*Harlow v. Fitzgerald* did, however, enunciate a test for the qualified immunity of government officials that may be viewed as more favorable to the defendant. *See* 102 S.Ct. at 2738. However, defendant Mitchell does not meet the test for qualified immunity formulated by Justice Powell in *Harlow.* In *Harlow,* the Court noted that

The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees [citing *Butz v. Econo-*

*mou, supra,* and *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] (1971)].

\* \* \* \* \* \*

Consistently with the balance at which we aimed in *Butz,* we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of far-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known [citing *Procunier v. Navarette,* 434 U.S. 555 [98 S.Ct. 855, 55 L.Ed.2d 24] (1978); *Wood v. Strickland,* 420 U.S. 308 [95 S.Ct. 992, 43 L.Ed.2d 214] (1975)].

\* \* \* \* \* \*

On summary judgment, the judge appropriately may determine not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

\* \* \* \* \* \*

Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate, and a person who suffers injury caused by such conduct may have a cause of action.

102 S.Ct. at 2738–2739 (footnotes omitted).

Thus, to determine whether defendant Mitchell has established a qualified immunity based upon the status of the applicable law at the time of the wiretap, the Court has examined the applicable case law of warrantless searches as it existed in late 1970 at the time that defendant Mitchell authorized the warrantless wiretap of Professor Davidon. In 1972, the U.S. Supreme Court, in *United States v. United States District Court (Keith),* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) held that electronic surveillance conducted for national security purposes is subject to the general Fourth Amendment law which requires a warrant issued by a judicial officer before the government may tap the phone of one of its citizens (407 U.S. at 320–322, 92 S.Ct. at 2138–39). In *Keith,* the Supreme Court applied the teachings of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) to wiretaps conducted in the interests of protecting national security from domestic threats. The Court upheld the general rule of *Katz* against the government's contention that the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.* provided a grant of power to the President with respect to domestic national security matters. In fact, the Court stated that the law of electronic searches made it clear that electronic surveillance in domestic security matters requires an appropriate prior warrant procedure. The *Keith* majority opinion reached this conclusion with little difficulty because of the clarity of the existing precedents including the 18th Century opinions of Lord Mansfield (407 U.S. at 316, 92 S.Ct. at 2136). Said the court:

> Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights. [citing *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)].

\* \* \* \* \* \*

It is true that there have been some exceptions to the warrant requirement [citing cases]. But those exceptions are few in number and carefully delineated [citing *Katz*], in general they serve the legitimate needs of law enforcement officials to protect their own well-being and preserve evidence from destruction. Even while carving out those exceptions, the Court has reaffirmed the principle that the 'police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,' [citing *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685, *reh. denied,* 396 U.S. 869 [90 S.Ct. 36, 24 L.Ed.2d 124] (1969) ].

407 U.S. at 318, 92 S.Ct. at 2137.

The *Keith* opinion clearly states that its holding is no break with the past but rather a logical application of the existing law. For this reason, the District of Columbia Circuit in *Zweibon v. Mitchell,* 606 F.2d 1172 (D.C.Cir.1979) *cert. denied,* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997, *reh. denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025, *reh. denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981) (*Zweibon III*) held that *Keith* was retroactive in effect. Applying the test for retroactive application set forth in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the D.C. Circuit found that *Keith* did not directly overrule past precedent and announced a rule foreshadowed by the Supreme Court's pre-1972 decisions such as *Katz v. United States, supra.* Said the D.C. Circuit:

> Statements by the Supreme Court in the late 1960s certainly demonstrated great concern over unrestrained warrantless wiretapping. Extension of that concern to the national security sphere was certainly likely, though perhaps not inevitable.
>
> \*    \*    \*    \*    \*    \*
>
> We believe that [*Keith* and other earlier cases] did not announce a new principle of law, but simply applied the constitu-

tional warrant requirement to national security situations. As a result, we cannot say that the outcome in those cases was not clearly foreshadowed.

606 F.2d at 1178. In *Zweibon III,* the D.C. Circuit also found there was no basis in law for limiting the warrant requirement for domestic national security surveillance to prospective application, holding that such limited application would not be consistent with the purpose and effect of the warrant requirement, the purpose of minimizing government invasion of personal privacy (606 F.2d at 1179–80), and that equitable considerations supported retrospective application of the *Keith* holding (606 F.2d at 1180–81).

Furthermore, the district court decision in *Keith* was entered on January 25, 1971 (*U.S. v. Sinclair,* 321 F.Supp. 1074 (E.D. Mich.1971)), the culmination of a series of events subsequent to a criminal defendant's motion to compel disclosure of certain electronic surveillance information and determine whether such evidence was unconstitutionally tainted. That motion was filed on October 5, 1970, more than one month prior to the Attorney General's authorization of the wiretap at issue in this case. The government responded to the motion on December 18, 1970. Thus, during the time of the Davidon tap (December, 1970 and January, 1971), the Justice Department had reason to know that its position regarding the need for a warrant was subject to both question and attack. After January 25, 1971, the government had overwhelming reason to know that its conduct was unconstitutional. The Eastern District of Michigan's decision was affirmed by the Sixth Circuit (444 F.2d 651 (1971)) and the Supreme Court. Under these circumstances, the *Keith* decision was clearly not a "sharp break in the law."

■ Though the Ninth Circuit Court of Appeals reached a different conclusion as to retrospective application of the *Keith* holding *see Weinberg v. Mitchell,* 588 F.2d 275 (9th Cir.1978), this Court finds the detailed and well-reasoned opinion of the D.C. Circuit more persuasive than that of the Ninth

Circuit. An examination of the *Katz* case supports the D.C. Circuit's view that *Keith* did not tell the Attorney General and other attorneys anything which they should not already have known concerning the Fourth Amendment protections applicable to electronic surveillance.

In *Katz,* the Supreme Court held that wiretaps constituted "search and seizure" within the meaning of the Fourth Amendment and that such surveillance was subject to the Fourth Amendment requirement that such searches be conducted, subject to a few narrow and limited exceptions, pursuant to a search warrant issued by a neutral and detached magistrate or judicial officer. The *Katz* court noted that

> Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes [citing *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951)] and that *searches conducted outside the judicial process, without prior approval by a judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.*

389 U.S. at 357, 88 S.Ct. at 514 (footnotes omitted; emphasis added). The *Katz* court further found that the government, in seeking to obtain evidence regarding Mr. Katz's allegedly illegal gambling, had not met any exception to the requirement of a warrant. In *Katz,* the court declined to give its holding only a prospective effect, even though the issue of whether wiretaps were "searches and seizures" was at least as unsettled as the issue [resolved in *Keith* ] as to whether domestic national security wiretaps were subject to less constitutional protection than criminal activity wiretaps.

The concurring opinion of Justice Douglas, joined by Justice Brennan, should have provided particular guidance to defendant Mitchell and all other attorneys regarding the constitutionality of warrantless domestic national security wiretaps. Justice Douglas observed

Neither the President nor the Attorney General is a magistrate. In matters where they believe national security may be involved, they are not detached, disinterested, and neutral as a court or magistrate must be. Under the separation of powers created by the Constitution, the Executive Branch is not supposed to be neutral and disinterested. Rather, it should vigorously investigate and prevent breaches of national security and prosecute those who violate the pertinent federal laws. The President and Attorney General are properly interested parties cast in the role of adversary, in national security cases. They may even be the intended victims of subversive action. Since spies and saboteurs are as entitled to the protection of the Fourth Amendment as suspected gamblers like petitioner [Katz], I cannot agree that where spies and saboteurs are involved adequate protection of Fourth Amendment rights is assured when the President and Attorney General assume both the position of adversary and prosecutor and disinterested, neutral magistrate.

389 U.S. at 359–360, 88 S.Ct. at 515–16. The Douglas-Brennan concurrence was in part a response to Justice White's concurrence which suggested that the court "should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable." 389 U.S. at 363–64, 88 S.Ct. at 517–18.

Thus, in 1967, the *Katz* majority opinion and two concurrences should have clearly alerted defendant Mitchell that electronic surveillance such as the Davidon tap was subject to the warrant requirement of the Fourth Amendment. Instead of seeking to obtain a warrant for the Davidon tap, defendant Mitchell and his aides gambled that Justice White's position would be accepted if the Court were to be faced with this issue in an actual case rather than a hypothetical debate. The Justice Department lost that gamble in *Keith.* Today, defendant Mitch-

ell asks that this Court conclude that he acted in good faith merely because there exists a general policy in favor of shielding public officials from unmeritorious lawsuits. *Nixon v. Fitzgerald* and *Harlow v. Fitzgerald* suggest no such result. Defendant Mitchell's disregard for the rights of those whose privacy was invaded becomes all the more incomprehensible in light of the ease with which the government could have sought a warrant for the Davidon tap. There was no need for instantaneous installation of the tap. As heretofore noted, the District of Columbia was well-supplied with judicial officers who could have been approached concerning the electronic surveillance. If such a neutral and detached magistrate were convinced of the existence of probable cause for electronic surveillance, a warrant could have been issued almost immediately.

Furthermore, had the Attorney General believed that national security considerations required immediate electronic surveillance, he could have installed the wiretap and then sought emergency judicial approval of this action pursuant to 18 U.S.C. § 2518(7) (a portion of Title III of the Omnibus Crime Control and Safe Streets Act of 1968). By following the statutory procedure or first approaching a magistrate or judge with a warrant request and a request for expedited consideration, defendant Mitchell could have pursued the surveillance he contends was necessary to the nation's security interests in a manner consistent with the clear language of the Fourth Amendment, *Katz,* and 18 U.S.C. § 2510. This, however, was not done by the Attorney General. Instead, he responded to the request of the FBI for the warrantless wiretap.

Furthermore, the Attorney General's action was in direct conflict with the language, legislative history and purpose of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–20 (effective date June 19, 1968).

Title III provides in relevant part that it shall be unlawful to intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire or oral communication unless such interception is permitted pursuant to Title III. (18 U.S.C. § 2511(1)(a)). Section 2516 of Title 18 sets forth the requirements necessary for obtaining authorization to conduct electronic surveillance. Title 18, § 2517 provides the standards which must be met for disclosure and use of intercepted wire or oral communications; 18 U.S.C. § 2518 sets forth a detailed procedure for obtaining and maintaining warrants to conduct electronic surveillance. Title III (18 U.S.C. § 2511) states that "[e]xcept as specifically provided in this chapter" interception of "any wire or oral communication is illegal." As heretofore noted, however, the Justice Department had contended that 18 U.S.C. § 2511(3) exempted national security investigatory wiretaps from Title III. This section, at the time of the surveillance at issue in this case, provided:

Nothing contained in this chapter [Title III] or in section 605 of the Communications Act of 1934 * * * *shall limit the constitutional power of the President* to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, *or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President* to take such measures as he deems necessary to protect the United States against overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial, hearing, or other proceeding *only where such interception was reasonable,* and shall not be otherwise used or disclosed

except as is necessary to implement that power.

25 U.S.C. § 2511(3) (1970) (emphasis added).

The government's contention that this segment of Title III countermanded Title III's overall proscription of warrantless wiretapping was rejected by the D.C. Circuit in *Zweibon I,* 516 F.2d 594 (D.C.Cir. 1975) and by this Court in its Memorandum of February 14, 1978 (447 F.Supp. 192). A reading of Title III in its entirety buttresses this determination. Sections 2510–20 of Title 18 of the United States Code comprise a Magna Carta for Americans fearful of excessive government and private eavesdropping. The statute requires that electronic surveillance take place only in accordance with the procedures of the Act, procedures set forth in painstaking detail in 18 U.S.C. § 2518. Throughout the Act, unauthorized "bugging" is condemned. Section 2512 prohibits the "manufacture, distribution, possession, and advertising of wire or oral communication intercepting devices." Section 2513 provides that such devices "may be seized and forfeited to the United States." Section 2515 prohibits, unless specifically authorized by Title III, the "use as evidence of intercepted wire and oral communications . . . before any court, grand jury, department, officer, agency, regulatory body, legislative committee, . . . State, or a political subdivision thereof . . . ." Section 2520 provides a civil cause of action for damages so that those whose communications are unlawfully intercepted may seek redress and so that the possibility of such private suits will deter unlawful electronic surveillance.

The message of Title III is clear: those who would engage in electronic eavesdropping must comply with Title III or act at their own peril. The language of Section 2511(3) states only a truism—that the statute does not prohibit the President and his authorized representatives from engaging in constitutional acts. As heretofore noted, pp. 1253–1257, *supra,* it should have been clear to defendant Mitchell that the type of surveillance utilized in this case was unconstitutional. At the very least, the Attorney General should have entertained serious doubts as to whether or not Section 2511(3) created an exception to the requirements of Title III and the clear overall thrust of the statute. Furthermore, the legislative history of Title III demonstrates that the scope of Section 2511(3) was to be determined by the requirements of the Constitution. *See Zweibon I,* 516 F.2d at 663–65.

■ In light of the statute (18 U.S.C. § 2510–20), its legislative history, and the clear case law interpreting the warrant requirement of the Fourth Amendment, defendant Mitchell's violation of plaintiff's clearly established legal right is apparent. This misunderstanding of the law is all the more surprising coming from the Attorney General, the chief law enforcement officer of the United States. It was incumbent upon the chief law enforcement officer of the United States in 1970 to be aware of the clearly defined Constitutional and statutory limitations on his authority to approve a warrantless wiretap under the undisputed circumstances in this case.

As the Supreme Court stated in *Harlow v. Fitzgerald,* an official who should have expected to know that his conduct would violate constitutional rights "should be made to hesitate." (102 S.Ct. at 2739). This the defendant, despite his position of authority, power, and trust, did not do. Defendant Mitchell, on the basis of this record, is not entitled to qualified immunity under the standards set forth in *Harlow v. Fitzgerald.*

This Court is well aware that the vitality of our federal system is bottomed on the Supreme Court's role in interpreting the Constitution as a living document subject to evolving judicial standards. Throughout the nation's history, litigants have sought to have the Supreme Court interpret the Constitution in ways favorable to their desires. In this case, the Attorney General was apparently persuaded by his subordinates that the nation's security would better be protected by resorting to electronic surveillance without the encumbrance of a warrant. However, as heretofore noted, the Supreme Court had clearly stated more

than three years before the installation of the Davidon wiretap that a warrant was required for such electronic surveillance. Undoubtedly, the Attorney General of the United States has a legal right to seek changes in the Supreme Court's interpretation of the Constitution. But this prerogative does not endow him with the right to ignore what the Supreme Court has previously determined to be a requirement of the Constitution. Under our federal system, this Court is required to interpret the Constitution's requirement of a warrant as declared by the Supreme Court in *Katz.*

## VI. *The Immunity Defense and Summary Judgment*

■ According to the standards set forth by the Supreme Court, an official enjoying such good faith immunity must assert this immunity as an affirmative defense, which defendant Mitchell has done in this case. To be immune, the official must have (1) reasonably believed that his actions were not against the law and not have had any reason to know that his actions would violate the law; and (2) not have taken the action with malicious intention to deprive the plaintiff of a federal right. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh. denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). In other words, defendant Mitchell was not "immune from liability if he knew or should have known that the action he took would violate the constitutional rights of the plaintiff, or if he took the action with a malicious intention to cause a deprivation." *Forsyth v. Kleindienst,* 599 F.2d at 1211, n. 7. The Third Circuit has recently stated that "the qualified immunity defense requires the defendant to prove the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief . . . if the factual representations are properly controverted, qualified immunity must be established as a defense by evidence presented at trial." *Black v. Bayer,* 672 F.2d 309, 316 (3d Cir. 1982) quoting *Scheuer v. Rhodes,* 416 U.S.

232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974).

In a motion for summary judgment, the moving party has the burden of demonstrating that there is no genuine issue of material fact. *See Ettinger v. Johnson,* 556 F.2d 692, 696 (3d Cir.1977); *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.,* 190 F.2d 817, 824 (3d Cir.1951). In considering a motion for summary judgment, the Court must view the evidence in a light most favorable to the party opposing the motion. *Goodman v. Mead Johnson & Company,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

■ Where cross-motions for summary judgment have been filed, each must be considered separately by the Court. *Rains v. Cascade Industries, Inc.,* 402 F.2d 241 (3d Cir.1968); C. Wright and A. Miller, *Federal Practice and Procedure,* § 2720 at 460–65. Thus, in this case, each party must, in support of its own motion for summary judgment, establish that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. The Court must consider each party's motion on an individual and separate basis determining, in each case, whether a judgment may be entered in accordance with the standards of Rule 56. Both motions must be denied if the Court finds that there is a genuine issue of material fact. *Rains v. Cascade Industries, Inc., supra.* C. Wright and A. Miller, *supra.*

In this case, the parties contest whether the actions of the Attorney General were done with malice toward Forsyth, Davidon, and other political dissidents opposing the Vietnam war. Plaintiff asserts that electronic surveillance of Davidon, a man who posed no clear and present danger to the national security, indicates malice toward the anti-war movement. Plaintiff further contends that the logs of the recorded conversations indicate that the agents made no attempt to cease overhearing conversations outside the alleged national security purpose of the tap and that this resulted be-

cause defendant Mitchell did not so instruct the agents. Defendants contend that they acted only for legitimate reasons with no malice toward the plaintiff. The parties also disagree as to the reasonableness of defendant Mitchell's conduct in failing to seek Court approval of the electronic surveillance, either before or after the installation of the wiretap.

To be sure, more than mere assertions are required to demonstrate the existence of a genuine issue of material fact. A party opposing summary judgment on the ground that there exists such a dispute must respond to an affidavit with more than a general denial (*Tunnell v. Wiley*, 514 F.2d 971 (3d Cir.1975); *Lesnefsky v. Fischer & Porter Co., Inc.*, 527 F.Supp. 951, 954 (E.D.Pa.1981). The Court should be particularly cognizant of this principle in evaluating the summary judgment motions of government officials, since public policy considerations favor the resolution of non-meritorious claims against such officials without forcing them to undergo the burdens of trial. *Harlow v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Reese v. Nelson*, 598 F.2d 822 (3d Cir.) *cert. denied*, 444 U.S. 970, 100 S.Ct. 463, 62 L.Ed.2d 384 (1979) the Third Circuit summarized the relevant considerations in ruling on such motions.

Although as a general proposition, the question of the qualified immunity of a [public] official is a matter for factual resolution, it is clear the issue need not always be a jury question. In *Procunier v. Navarette*, the Supreme Court affirmed the entry of a summary judgment on the basis of a qualified immunity.

\* \* \* \* \* \*

In evaluating the good faith defense, moreover, it need not be necessary to determine whether the defendants' conduct did in fact violate the plaintiff's constitutional rights or whether the procedures utilized by Lancaster County were constitutionally deficient. As *Navarette* makes clear, the immunity defense should not be rejected if at the time that the act was committed there was no

clearly established constitutional right *and* there was no malicious intention to deprive the plaintiff of a constitutional right or cause him other injury.

598 F.2d at 826 (citations omitted; emphasis added). *See also Princeton Community Phone Book, Inc. v. Bate*, 582 F.2d 706, 712 (3d Cir.) *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

Ordinarily, a dispute of fact such as those found in this case would preclude summary judgment. However, the question in this case has become a legal one. The Third Circuit remanded this case so that this Court could determine the scope of defendant Mitchell's immunity. As heretofore noted, the record in this case makes it clear that the Attorney General was not acting within his prosecutorial role and thus may benefit only from a qualified immunity. To obtain immunity under the traditional test, Mr. Mitchell must show both that (1) he believed his actions were lawful and he had no reason to know that his actions would violate the law *and* (2) he did not act with malicious intent to deprive plaintiff of a constitutional right. As heretofore noted, the Court finds that defendant Mitchell engaged in conduct that he, the chief law enforcement officer of the land, could not have reasonably believed to be lawful. The Court determined that defendant Mitchell should have known that the surveillance at issue in this case required a warrant. Thus, defendant Mitchell has failed to satisfy the first prong of the two-part criteria for qualified immunity as set forth in *Wood v. Strickland* and *Procunier v. Navarette*.

*Harlow v. Fitzgerald* has further refined traditional qualified immunity analysis and underscores the futility of a trial in this case for the purpose of determining the good faith immunity of the Attorney General. *Harlow* represented "an adjustment of the 'good faith' standard established by [prior Supreme Court] decisions." 102 S.Ct. at 2737. As Justice Powell observed in *Harlow*,

Decisions of this Court have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The

objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' [citing *Wood v. Strickland*]. The subjective component refers to 'permissible intentions.' ... Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff] *or* if he took the action *with malicious intention* to cause a deprivation of constitutional rights or other injury....' [quoting *Wood v. Strickland*].

102 S.Ct. at 2737. (citations omitted; emphasis the Court's). The *Harlow* Court then discussed a significant problem with subjective aspects of the test—its tendency to require government officials to defend unmeritorious suits. The Court's adjustment was to direct the federal courts to first make the objective inquiry into the state of the law and determine whether the defendant's conduct violated a clearly established Constitutional right. If the defendant has deprived plaintiff of a clearly established constitutional right, absence of malice would not relieve the defendant of liability, since the defendant violated a clearly established constitutional right.

Said the *Harlow* Court:

On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether the law was clearly established at the time an action occurred.

If the law was clearly established, the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct. [T]he defense would turn primarily on objective factors.

\* \* \* \* \* \*

[This] test focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he

should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.

102 S.Ct. at 2739. *See also Saunders v. Parole Agents,* Civil Action No. 81–930 (E.D.Pa. Sept. 30, 1982) (Luongo, Ch.J.); *Druckenmiller v. United States,* 548 F.Supp. 193 (E.D.Pa.1982) (Troutman, J.).

The mandate of *Harlow* is clear. This Court must interpret the objective law and determine whether defendant Mitchell's conduct violated a clearly established legal right. As heretofore noted, this Court, upon reviewing the decisions of the Supreme Court, has found that in 1970 plaintiff's right to be free of warrantless electronic surveillance, even surveillance conducted pursuant to a national security investigation, was clearly established. Defendant Mitchell, the Attorney General of the United States, should have known that his conduct violated this clearly established legal right and should have refrained from authorizing the wiretap. Thus, according to the objective standard for qualified immunity set forth in *Harlow,* defendant Mitchell is not entitled to the limited immunity of good faith.

In other instances, the question of the reasonableness of a government official's action might require findings of fact by the Court or a jury. In this case, however, the question of reasonableness is a legal question that must be answered by legal research rather than the taking and weighing of testimony. It would be ludicrous to permit a jury of laymen to hear "evidence" about the legal doctrines surrounding the Fourth Amendment and then instruct them that they as laymen are to determine whether the Attorney General's construction of the law was reasonable. The Supreme Court implicitly recognized this in *Harlow.* Furthermore, the Court having before it cross-motions for summary judgment, has determined on the basis of the record as it now stands that there is no genuine issue of material fact as to liability. As heretofore pointed out, the Attorney General, in his own deposition, has clearly stated that the warrantless wiretap which

he authorized was solely for the purpose of investigating a national security matter and was not intended to obtain evidence necessary for a criminal prosecution.

The Court recognizes that in certain instances a legal defense may require fact-finding for its evaluation. For example, the Supreme Court has enunciated the following narrow exceptions to the warrant requirement of the Fourth Amendment. These are: where the search is incident to a lawful arrest (*Warden v. Hayden,* 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967)); where the failure to act immediately (even though without a warrant) would endanger the lives of law enforcement personnel or others (*Id.* at 299, 87 S.Ct. at 1646); where the objects sought in the search are likely to disappear if a warrantless search is not immediately conducted, (*Carroll v. United States,* 267 U.S. 132, 152–54, 45 S.Ct. 280, 284–85, 69 L.Ed. 543 (1925); *Cooper v. California,* 386 U.S. 58, 59, 87 S.Ct. 788, 789–90, 17 L.Ed.2d 730 (1967); *Brinegar v. United States,* 338 U.S. 160, 176–78, 69 S.Ct. 1302, 1311–12, 93 L.Ed. 1879 (1949)); where law enforcement officers respond to a sudden and unanticipated emergency (*McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); or where a suspect is in flight (*Id.* at 455, 69 S.Ct. at 193). These were the few "well-delineated exceptions" to the warrant requirement which the Supreme Court referred to in *Katz v. United States, supra,* 389 U.S. at 357, n. 19, 88 S.Ct. at 514, n. 19. A case presenting one of these exceptions might require a trial concerning questions of fact. However, defendant Mitchell's defense in this case, although both legal and factual, does not involve a factual dispute. As heretofore noted, defendant Mitchell has maintained throughout this litigation that he approved the warrantless wiretap pursuant to a national security investigation.

▮ Whether plaintiff is entitled to punitive damages and the amount of any such damages is a matter of federal common law. *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir.1965). Federal common law permits recovery of punitive or exemplary damages where the plaintiff has shown a violation of his civil rights (*Id.* at 87) even if he does not receive an award of compensatory damages (*Cochetti v. Desmond,* 572 F.2d 102, 105 (3d Cir.1978); *Fisher v. Volz,* 496 F.2d 333, 347–48 (3d Cir.1974), provided that plaintiff can demonstrate that the defendant "acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so. . . ." *Cochetti v. Desmond, supra,* 572 F.2d at 106. *See also Scott v. Plante,* 641 F.2d 117, 135 (3d Cir.1981); *Fisher v. Volz, supra,* 496 F.2d at 347. The Court will therefore set a hearing to determine whether the plaintiff is entitled to punitive damages and/or compensatory damages.

As heretofore noted, this case was remanded to this Court by the Third Circuit to determine whether Attorney General Mitchell is entitled to the absolute immunity of a prosecutor or a qualified immunity. (599 F.2d at 1217). The Third Circuit did not disturb this Court's earlier ruling that there existed genuine issues of material fact which precluded the granting of either motion for summary judgment concerning defendant FBI agents Albert Cooper and David Porter, who conducted the wiretap at issue in this case. (Memorandum of February 14, 1978, 447 F.Supp. 192). Since remand, the parties have not presented any additional facts either by affidavits, answers to interrogatories, or depositions, nor have they presented any reason for the Court to reconsider its earlier ruling concerning the FBI agents. In particular, the parties have not discussed the applicability of *Harlow* to the FBI agents. However, since *Harlow's* holding appears to be limited to "government officials performing discretionary functions" (102 S.Ct. at 2738), it may be that *Harlow* does not alter the two-prong immunity test of *Wood v. Strickland* traditionally applied to FBI agents engaged in ministerial, non-policy-making functions.

It may be that the agents can establish by a preponderance of the evidence that they acted in good faith, on reliance of the

Attorney General's authorization of the wiretap, and could thus satisfy the first prong of the two-pronged test for qualified immunity set forth in *Wood v. Strickland* and its progeny.

■ In any event, there are genuine issues of material fact concerning the conduct of the FBI agents in proceeding with the wiretap and whether they acted with malice, particularly in light of the plaintiff's claim that they failed to minimize the interception and recording of the plaintiff's conversations concerning his political activities. Therefore, trial is required not only on the question of damages, but on the question of liability as to defendants Cooper and Porter.

## MEMORANDUM

### On Motion To Certify For Immediate Interlocutory Appeal

Defendants have filed with this Court a motion requesting the Court to certify for immediate interlocutory appeal its decision of November 12, 1982. For the reasons hereinafter set forth, the Court will deny defendants' motion.

Plaintiff Keith Forsyth ("Forsyth") initiated this action in 1972, seeking to recover damages in connection with the federal government's electronic interception of telephone conversations that he had with Professor William Davidon, the subject of a government wiretap. Plaintiff contends that these interceptions violated his rights under 18 U.S.C. § 2510, *et seq.* (The Omnibus Crime Control Act) and the First, Fourth and Ninth Amendments of the Constitution. Though plaintiff's complaint originally named former Attorney General Richard Kleindienst and former FBI Director L. Patrick Gray, he subsequently admitted that the claims against them should be dismissed. On February 14, 1978, the Court entered an order dismissing plaintiff's complaint as to these two defendants. The defendants remaining in this action are former United States Attorney General John Mitchell, who authorized the wiretap at issue, and two employees of the Federal Bureau of Investigation ("FBI"), who actually intercepted the conversations involving plaintiff.

After discovery was completed, both parties filed cross-motions for summary judgment, which the Court denied in its Memorandum of February 14, 1978 (447 F.Supp 192 (E.D.Pa.1978)). The United States Court of Appeals for the Third Circuit under the "collateral order doctrine" heard the appeal on behalf of defendant Mitchell in connection with his claim of absolute immunity but determined that the denial of the motion for summary judgment as to qualified immunity was not appealable. The Third Circuit subsequently remanded this case and that of *Burkhart v. Saxbe,* 448 F.Supp. 588 (E.D.Pa.1978) "to conduct any additional inquiry that may be necessary" to determine the scope of official immunity of defendant former Attorney General John Mitchell, a defendant in this case. *Forsyth v. Kleindienst,* 599 F.2d 1203, 1217 (3d Cir. 1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997, *reh. denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981). Pursuant to the remand, this Court held a hearing and in its Memorandum and Order of November 12, 1982 determined that defendant Mitchell was not entitled to absolute immunity under the standard set forth by the Third Circuit and that factual issues requiring trial remained to be determined in order to determine the liability of the two FBI agents who conducted the wiretapping at issue in this case and to determine the damages suffered by plaintiff Forsyth. The Court also granted summary judgment in favor of the plaintiff as to the liability only of defendant Mitchell based on the recent United States Supreme Court decision of *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow* announced a refinement in the traditional law of qualified immunity as applied to government officials performing discretionary functions. Under the *Harlow* standard, a government official is immune from suit if the law was not clearly established at the time of the official's allegedly wrongful conduct. This Court, in reliance on *Harlow,* determined that such officials

are liable in the event they violated clearly established law. The *Harlow* adjustment of official immunity has made irrelevant the subjective good faith of such government officials performing discretionary acts in a clearly illegal manner. *See* Memorandum of November 12, 1982 at 33–36. *See also Saunders v. Parole Agents,* Civil Action No. 81–930 (E.D.Pa. Sept. 30, 1982) (Luongo, Ch.J.); *Druckenmiller v. United States,* 548 F.Supp. 193 (E.D.Pa.1982) (Troutman, J.).

Upon reviewing the law of electronic surveillance as it existed in late 1970 and early 1971, the time of the wiretaps at issue in this case, this Court determined that the clearly established law of that time made defendant Mitchell's warrantless electronic surveillance an unconstitutional violation of the plaintiff's rights. *See* Memorandum of November 12, 1982 at 13–28. For that reason, the Court applied *Harlow* to the instant case and granted plaintiff's motion for summary judgment as to the liability only of defendant John Mitchell. The Court denied the remainder of plaintiff's summary judgment motion, denied defendants' summary judgment motion, and set a trial date of December 15, 1982 for the purpose of determining the liability of Albert Cooper and David Porter, the FBI agents who conducted the electronic surveillance at issue in this case, and for the purpose of determining damages suffered by plaintiff Keith Forsyth. The Third Circuit's remand concerned only defendant Mitchell. (599 F.2d 1203).

On November 24, 1982, the defendants filed a motion for certification pursuant to 28 U.S.C. § 1292(b). On December 2, 1982, plaintiff filed a response opposing defendants' motion. For the reasons hereinafter set forth, the Court will enter an order denying the motion.

Title 28, § 1292(b) of the United States Code provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing such order.

Thus, a district judge is authorized pursuant to § 1292(b) to certify for appeal a nonfinal order that involves a controlling question of law as to which there is substantial ground for difference of opinion if he believes that an immediate appeal from the order may materially advance the ultimate termination of the litigation. The Court's Order of November 12, 1982 granting partial summary judgment in favor of the plaintiff as to defendant Mitchell's liability and denying other aspects of the cross-motions for summary judgment is not a final, appealable Order. Section 1292(b), certification for interlocutory appeal, is to be used only in exceptional cases. *See Milbert v. Bison Laboratories, Inc.,* 260 F.2d 431, 433 (3d Cir.1958) (en banc). The critical issue in each case is whether certification would promote the policies underlying interlocutory appeals, including the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense. *See Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *McNulty v. Borden, Inc.,* 474 F.Supp. 1111 (E.D.Pa. 1979); *In re Magic Marker Securities Litigation,* 472 F.Supp. 436 (E.D.Pa.1979).

Defendants contend that there is substantial ground for difference of opinion as to the effect of *Harlow v. Fitzgerald, supra,* on this case. This Court does not agree. Defendants contend that this Court's interpretation of *Harlow* may differ from other court applications of *Harlow.* However, Courts in the Eastern District of Pennsylvania have read *Harlow* as eliminating the subjective good faith components of a qualified immunity defense where the defendant is a government official performing discretionary functions. *See Saunders v. Parole Agents, supra; Druckenmiller v. United States, supra.* Memorandum of November 12, 1982 at 33–38. The law of

electronic surveillance was clearly established in 1970 and this law clearly forbade warrantless wiretapping for national security purposes. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In 1972, the United States Supreme Court underscored the clarity of this law by unanimously holding that such warrantless wiretapping was illegal and unconstitutional and that defendant Mitchell's attempted justification for warrantless wiretapping was without any legal justification. *See United States v. United States District Court (Keith),* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

Even if this Court were to accept defendants' argument that there existed a substantial difference of opinion regarding this Court's determination of the applicable law as to defendant Mitchell, the requirements of 28 U.S.C. § 1292(b) would nevertheless remain unsatisfied. Section 1292(b) also requires that, in order to certify an interlocutory question for appeal, the district judge find that an immediate appeal would advance the ultimate termination of the litigation. In this instance, the Court has determined that interlocutory appeal would fail to advance the conclusion of this already 10-year-old case and that an appeal would at this time, once again, delay the ultimate termination of the litigation.

In *Forsyth v. Kleindienst,* (599 F.2d at 1205), the Third Circuit rejected the contention that the FBI agents were entitled to absolute immunity. Therefore, there is no difference of opinion regarding this Court's determination that the FBI agents are entitled only to a qualified good faith immunity. As the Court noted in its Memorandum of November 12, 1982, the FBI agents are entitled to qualified immunity if they (1) reasonably believed that their actions were not against the law and did not have reason to know that their actions would violate the law; and (2) did not engage in the challenged conduct with a malicious intention to deprive the plaintiff of a constitutional right (at 28). Resolution of the FBI agents' qualified immunity defense is not affected by *Harlow,* the legal standards of which apply only to government officials performing discretionary functions. A determination of the FBI agents' entitlement to qualified immunity thus requires trial and factfinding. The Court had previously made this same determination in its Memorandum of February 14, 1978, 447 F.Supp. 192, 195 (E.D.Pa.1978). Thus, it is beyond doubt at this juncture that trial will be required in this matter regardless of whether defendant Mitchell should prevail on any appeal challenging this Court's determination that the plaintiff is entitled to summary judgment as to the liability only of defendant Mitchell. Therefore, an interlocutory appeal raising defendant Mitchell's argument in opposition to this Court's Memorandum of November 12, 1982 would not advance the ultimate termination of this litigation. Such an appeal would once again delay the completion of this case.

As heretofore noted, this action was filed in 1972. Discovery was cumbersome and protracted. It was not until 1977 that this Court received the parties' cross-motions for summary judgment. The Court denied these motions in early 1978. The government sought reconsideration but, while this Court was considering the reconsideration motion, the government appealed to the Third Circuit. After the Third Circuit decision remanded to this Court the question of Attorney General Mitchell's absolute immunity, the government sought certiorari, which was denied in 1981. Thereafter, this Court, accommodating the requests of the government, was not able to hold the hearing required by remand until early 1982. In June 1982, the *Harlow* decision required this Court to further revise its analysis of defendant Mitchell's scope of immunity. This litigation has already been delayed too long. Permitting an interlocutory appeal would not only run contrary to the express language of § 1292(b), but would mean further delay.

Furthermore, defendant Mitchell will not be prejudiced or harmed pendente lite by trial in this matter as to the FBI agents and as to plaintiff's damages. A major policy underpinning the doctrine of official immunity, both absolute and qualified, is a desire to spare high-ranking government officials

the time, diversion and expense of discovery and trial. In this case, discovery is completed and Mr. Mitchell need not undergo any proceedings concerning his liability, which has already been determined by this Court as a matter of law pursuant to *Harlow*. A post-trial appeal by defendant Mitchell will serve his legal and financial interests every bit as well as would an interlocutory appeal.

The Court will therefore enter an Order denying the government's motion for certification pursuant to 28 U.S.C. § 1292(b). In connection with that motion, the government has also requested that this Court stay the proceedings in this matter if certification is granted. Since the Court will not certify this case for interlocutory appeal, the government's stay request is moot and the Court will deny a stay. The government has also requested a continuance of the trial and hearing date of December 15, 1982. In order to accommodate the scheduling demands of the government's counsel, the Court will grant this request and set a rescheduled trial date of January 14, 1983. An appropriate order accordingly will be entered.